Good morning, your honors. My name is Gary Huss. I am counsel for appellant Mr. Lopez. I was trial counsel. I wanted to first note that there is a typographical error in my reply brief, page 8, the fourth line, where it reads Mr. Redberg, it should read Mrs. Redberg. Today I should be changed to Mrs. Redberg. As for the third and fourth arguments made in my opening brief, it's my intention to submit those. What I would like to do is focus on the eyewitness testimony in this trial. As trial counsel, I was troubled by the procedure that happened here, and I can best sum it up in this way, that essentially the conviction rests on the strength of the eyewitness testimony of two individuals, Officer Barron and the neighbor, Mrs. Redberg. Officer Barron concealed himself behind a woodpile 100 yards away from the home and was taping with a videotape the events that were taking place at that time. I would like to say, I've got your word description, but given the, we can all look at the tape and make our own conclusions, as far away as that may have been, as you say, there's a lot of time spent on the person that's been identified as your client, and I would like to ask you to give us a little bit more detail on that. And there are some distinct characteristics, and why wouldn't a neighbor who's familiar with Mr. Lopez be able to, from that videotape, be able to identify him as the defendant? Well, I must say, I've looked at the tape also, and it seemed that your defendant was quite clearly visible, and he just would be identifiable, I think, by anybody who was familiar with him, who was his neighbor. Let me answer the first question. The same question, really. Sounds like you're in trouble. Well, I believe that the tape is unduly suggestive to the neighbor, and in the sense that they wait a considerable length of time. She obviously knows that her neighbor has been arrested. She shows up in court and sees him there, and for the first time, she's asked to look at a video that shows her next-door neighbor's house. I think it's unduly suggestive to simply ask that witness, who do you think that is? She identifies him from the tape, and there's no dispute over that, but what I find troubling is if you look at the quality of the tape, what you're really asking people to do is give you an opinion as to who they think that person is, and the tape itself and the grainy quality is not reliable. Did the trial court address this question of whether it was unduly suggestive? Well, we raised the objection. I think the court decided that it was reliable on balance going through the different factors. So not unduly suggestive? I don't think the trial court felt it was unduly suggestive. I felt that it was. What standard of review do we apply to the trial court's determination, who had the witnesses there in addition to the tapes? I think the standard of review would be was there an abuse of discretion by the trial? Is this an abuse of discretion? I mean, that's a pretty high standard. I think we'd be maybe looking at clearly erroneous. Why is it an abuse? The reason I feel it's an abuse is I look at how the officer bootstraps himself from an unreliable tape and an unreliable still photo taken from that tape. Did you focus on the neighbor? I mean, I thought we were talking about the neighbor. You seem to have shifted over to the videographer. I think as to the neighbor, it's simply the lapse of time and the viewing of an unreliable tape makes it inherently suggestive. Well, I'm curious about your theory because it seems to me, and we're certainly currently aware of the power of photographic images, that if you would have preferred that somebody describe verbally what was going on, and here you have a videotape that you say it's grainy. It may be slightly fuzzy, but grainy isn't the word that comes to my mind, and seeing this fellow walk back and forth with his hair color and fairly distinctive features, if maybe the cop, I mean, maybe the videographer never saw the guy, but for a neighbor who has a physical observation, what else would you suggest if you're showing the activity of the house? A house that she's familiar with because, what, she's next door to it. What have we done in the past to safeguard eyewitness identification? Sometimes we've had photographic lineups to test the reliability. Sometimes we've had live lineups. There's a reason for those, and why in this case are those efforts completely bypassed by the police when they know that eyewitness identification is important? Why do they wait until the time of trial to show a witness? I saw that in your brief, but I'm trying to, in this sense, it's sort of like if a glove fits. In the O.J. case, I mean, the prosecutor puts the witness on and says, okay, I'm going to show you this tape. Who do you think this is? You think that if it had been a pretrial identification that you wouldn't be arguing that it had been suggestive? Indeed, that's what you're arguing, it seems to me, with the police officer. He saw the still ahead of time, and then he comes in and identifies the tape. So I'm just trying to understand what process here we're filtering out. Well, between the officer and the neighbor, there is a difference. I understand that. I'm troubled by the officer because they wait many months to have him look at the tape. Then they start showing him a known booking photo of the defendant, and then they have him show up in court and watch him. And to me, what they're doing is they're bridging the gap between a poor-quality video and his desire to support the case as one of the primary officers. He has a vested interest in the case. The neighbor, though, doesn't have those earmarks. Let's say you're right about the police officer. The neighbor's testimony is very compelling. I'm sorry, I couldn't hear you. The neighbor's testimony is very compelling. Let's say you're right about the officer, but it seems to me that in any fair look at this, that would be harmless error in light of what the neighbor testified to. I think it's important to keep in mind that the neighbor wasn't there when the events occurred. She's a neighbor. But she wasn't around when the day that this happened. And so they wait about a year later, they ask her to look at a photo of her neighbor's house, which she obviously is going to recognize. And if that isn't unduly suggestive. Well, you see, the problem is Judge Fletcher's right. The underlying predicate fact is whether something was unduly suggestive. And the judge's conclusion that it was not is tested on a clearly erroneous standard. The overall test for the admission of evidence is abuse of discretion, but it has to be clearly erroneous. And you haven't convinced me yet that it was clearly a decision by the trial judge was clearly erroneous when the trial judge concluded this was not unduly suggestive. What you're arguing is weight, not really admissibility. When you talk about weight, I submit that when officers are allowed to opine as to who the person is in the tape, a jury is going to give a lot of weight to that. And yet an officer is no different than a non-officer witness in formulating eyewitness identification. I'm willing, you know, I come back to where Judge Fletcher was. I distinguish, as you do, between the officer and the neighbor. But given that the neighbor seems to have made a decent identification, why isn't it harmless error that the officer's additional identification was put forward? What's your argument on harmless error? I believe the only argument I can make is that it's unduly suggestive to take a neighbor who did not witness the events and wait approximately a year and have her come to court and show her a videotape and a still photo from that videotape of her next-door neighbor's house and show her somebody that's similar to her neighbor and say, can you recognize that person? It's the quality of the tape that isn't inherently reliable enough for her to make that speculation. That's where, to me, it was like rolling the dice. It was guilt by association. You're saying it's guilt by association because he was shown walking back and forth in front of a house she recognized. I think what I'm saying is it's unduly suggestive to do that with a neighbor when she wasn't even present. And, you know, there really isn't anything else I can say. I think that the procedure here was too relaxed. And when you get too relaxed with eyewitness identification, it opens the door for an unfair trial for a defendant. And that's what happened. What should they have done, in your view? What did the law compel with respect to the neighbor then? They should have shown her this tape, five similar tapes with five actors with red hair. What would they be required to do? The problem I have with the neighbor is she wasn't there. What should they have done? You say this was bad. What should they have done? Do you have any ideas on that? You want us to write an opinion that say they can't do this. So if they can't do this, what can they do? And the question is, well, what's that? I guess what they should have done is they should have done more to test the reliability of what she's saying. How? They're showing her only one videotape of an event that she didn't witness. So what should they have done? And asking her to speculate. What should they have done? Perhaps they should, you know, frankly, I don't know what else they should have done. I didn't like the fact that they have her show up at the last minute. But, you see, you're asking us to write an opinion. You can't do this. So it would be nice to know what they can do. I mean, can they never use the neighbor ever under any circumstances? You know, if they can't show it to her for the first time, and then you're going to, the same argument attains if they show the tape to her in the police station. It's no different court than the police station. They show her the tape. Do you recognize anybody? The guy with the red hair is my neighbor. Then you'd argue that's unduly suggestive because it's a granny tape and she wasn't there. So do you have to show her five tapes with, you know, Brad Pitt playing one red-haired guy and somebody else playing another red-haired guy? Well, it's a difficult question, and I don't have an answer for it, frankly. I think the only answer is that I think it's unduly suggestive for someone that didn't even witness the events to do it in this way. She wasn't testifying to what he was doing. She was just testifying to whether or not it was he. Right. This is an after fact. Right. Who does she think is in the tape? Yeah. Okay. She says she knows. Thank you, counsel. Good morning. My name is Laurel Montoya. I'm representing the United States. In this case, I don't think that the in-court identification of the defendant from the videotape by Detective Barron or the neighbor was improper. So why don't you talk about something else? We have an old saying, don't shoot a dead duck twice. Okay. Well, I did like the court's comments about having Brad Pitt playing one of the actors on the videotape. That would be unduly suggestive. They think he was a Trojan warrior. Regarding the single photograph and the videotape, again, I don't think that was unduly suggestive, but I think that the court's comments about having Brad Pitt playing one of the actors on the videotape   was unduly suggestive. Based on the totality of the circumstances in this case, the neighbor was not. What about the supervised release issue? That's what I'm thinking about. The supervised? Yeah. The safety valve issue or the supervised release? Supervised release. I don't know what to say in that regard, Your Honor, because I didn't see that as an issue. Is the court addressing? Well, if you don't see it as an issue, that's fine. Is it regarding the sentencing of the defendant and whether or not the defendant's sentence was disparate? That was one of the issues brought up by the defense. I don't feel that it was disparate based on the sentences received by the other defendants. I don't think there's any indication, as I stated in my brief, that the defendant was penalized for not pleading guilty. I mean, for not pleading guilty proceeding to trial. The defense in his brief did not characterize the sentence of the co-defendant Alejandro Pano Cano correctly. That co-defendant was sentenced to 168 months, was imprisoned with 60 months of supervised release. And in this case, the defendant was sentenced to 235 months because he was found to be a level 38 with a criminal history category of 1. And comparing those two sentences and the defendant's involvement, I don't feel that the court can find that that sentence was disparate regarding the supervised release. Now, the judge didn't try to make any distinguishment between the two. If you look at their two histories, you can't see any difference, really, between them. I mean, the judge did nothing to tell us what the difference or the reason for the difference. Well, I don't recall the sentence of the defendant Alejandro Pano Cano being brought up at the time of the sentencing of Mr. Lopez. And if that was the case, and I don't recall what the court said in comparing the two, where the defense characterized Mr. Alejandro Pano Cano's sentence as 60 months, that was incorrect. It was 60 months of supervised release. And regarding the difference in the sentence, my only thought on that is because Mr. Alejandro Pano Cano was given three levels off for acceptance of responsibility where it is clear from the statement of the defendant that he did not accept responsibility, even though he did participate in an interview and it's the government's position that the court was correct in denying the safety valve relief, that he did not sufficiently admit his participation such as to receive three levels off for acceptance of responsibility. Well, the other defendant was denied the safety valve downward because they didn't believe him either. Correct. So when you say that it was for acceptance of responsibility, maybe we're talking about one guy going to trial and the other not. Well, I think that the court was ‑‑ I did not find that from the record, that it was one person went to trial and one person did not. Alejandro Pano Cano, my recollection is, again, that he did not ‑‑ Well, the record's clear. One went to trial and one did not. That's correct. But I don't think that the 235 months versus the 168 months is so disparate that the defendant is penalized for not pleading guilty. And I don't think that he should be given credit or given the three levels reduction where he did not adequately accept responsibility for his participation in this offense. Regarding the determination of the safety valve relief, based on the record and based on the information presented to the court, again, I think that the court was justified in not granting safety valve relief. The defendant did not ask for a hearing as to this particular issue, and I don't feel that the court has a responsibility to respond to a grant, a hearing where the defendant does not specifically request. The defendant makes the assertion that he was entitled, yet again, as I previously stated, he did not specifically request a hearing. And based on all the evidence before the court, not only what we argued during the course of the hearing, but taking into consideration the trial testimony, the court felt that the defendant was not truthful when he stated that he had no idea what was going on until he realized at the last minute, when based on the evidence presented on behalf of the government presented, Ms. Bredwer's testimony that items were being moved out of the house, that it was looking junky, that items were being unloaded from the vehicle the weekend prior to the event, and the event occurred on a Thursday, that it was not conceivable or it just didn't seem to be truthful for the defendant to ask the court to believe that he did not know it was going on until the last minute when he decided that, oh, gee, they're manufacturing methamphetamine, now I must leave the residence. I threw you a curveball. The supervised release question is about the next case, not this one. I could read from the expression on your face that Judge Fisher was right, wrong case, so I apologize. You sent me a message very clearly. What are you talking about? Sorry. I was trying to be polite. I don't have any further comments unless the court has any additional questions. No, thank you, counsel. Thank you very much. Do you have any response? Would you like to talk about supervised release? Yeah. No, I'm prepared to submit it. All right, thank you, counsel. Thank you. The case just argued. We appreciate your help. This order is submitted. And we'll go to the next case, Reginald Atkins, United States versus. Good morning, Your Honors. Katherine Alfieri appearing for the appellant and defendant, Reginald Atkins. And I really don't want to talk about supervised release either, but if you get to that point, I'd be happy to address it with the court. I would like to begin my argument with the fact that this is a case in which the
judges: B. Fletcher,trott, Fisher